IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MAURICE BOSTON : CIVIL ACTION
:
v. :
:
GRAPHIC PACKAGING :
INTERNATIONAL, LLC : NO. 22-3473

## MEMORANDUM

**Padova, J.** **March 24, 2025**

Plaintiff Maurice Boston brought this action against his former employer, Graphic Packaging International, LLC ("GPI"), after GPI terminated his employment. Plaintiff contends that he was terminated and otherwise discriminated against by GPI because of his race in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. GPI has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, we grant the Motion and enter judgment in favor of GPI.

## I. BACKGROUND

The record evidence shows that GPI "manufactures paperboard packaging used to package consumer goods." (Moore Decl. (GPI Ex. O) at APPX 0483 ¶ 3.) GPI has a facility near Valley Forge, Pennsylvania that transforms paperboard into consumer packaging products. (Id. ¶ 4.) That facility employs 175 full-time employees. (Id. ¶ 5.) GPI first hired Plaintiff, who is African American, as a Sheeter Operator on a temporary basis on December 21, 2016. (Id. ¶ 6; Boston Dep. Vol. 2 (GPI Ex. D), Ex. 4 at APPX 0202.) Plaintiff became a full-time employee and member of the union after 90 days. (Moore Decl. ¶ 6.) Plaintiff's job was located at the Valley Forge plant, where Plaintiff primarily worked the night shift. (Boston Dep. Vol. 2, Ex. 4

at APPX 0175; Moore Decl. ¶ 6.)  His employment with GPI was terminated by letter dated June 3, 2021.  (Boston Dep. Vol. 2 at 261; Boston Dep. Vol. 1 (GPI Ex. H) at APPX 0307.)  The reason given for his termination was that Plaintiff had too many "attendance points."  (Boston Dep. Vol. 2 at 261; Boston Dep. Vol. 1 at APPX 0307.)

GPI's attendance policy applies to all of its hourly employees working at the Valley Forge plant.  (GPI Ex. C ¶ 2.2.1.)  Under the attendance policy, employees are given attendance occurrence points ("attendance points") for a full day unexcused absence (1 point); being tardy (1/2 point for less than 2 hours late, 1 point for more than two hours late); leaving early (1 point); failure to clock in or out (1/2 point); and being AWOL or calling in more than two hours late (four points).  (Id. ¶ 3.1.2.)  The policy also requires employees to notify GPI at least 30 minutes before the start of their shift if they will not be at work at their scheduled start time and a failure to do so results in an attendance point.  (Id. ¶ 3.2.3.)  Therefore, an employee who is late and does not notify GPI at least 30 minutes before the start of their shift will receive one and 1/2 attendance points, 1/2 point for being tardy and one point for the call-in violation.  (Id. ¶ 3.2.4.)  An employee will be terminated if they accumulate nine points.  (Id. ¶ 3.5.1.)  If an employee has perfect attendance for sixty days, one point is deducted from their total.  (Id. ¶ 3.1.3.)  Approved absences, including approved vacation time, funeral leave, short term disability, FMLA leave, and weather emergency, are excused and do not result in attendance points.  (Id. ¶ 3.1.4.)  If an employee is absent for consecutive days due to the same illness and has medical documentation, only one attendance point is charged for the illness, no matter how many consecutive days are missed.  (Id. ¶ 3.3.1.)  If the employee does not provide medical documentation, the employee may receive attendance points for each day absent.  (Id.)

Robin Bender was the Human Resources Coordinator for GPI who notified Plaintiff that he was being terminated for accrual of more than nine attendance points.  (Boston Dep. Vol. 1 at APPX 0307.)  The termination letter that she sent him on June 3, 2021 states the reason for his termination as follows:

> On May 6, May 7, May 17, and May 29 you incurred one (1) attendance point[] for each day when you failed to report to work as scheduled in addition to calling out late (1 attendance point) and a late arrival (/5 attendance points).  This makes the total number of attendance points you have incurred as of May 29, 2021 10.5, which warrants immediate termination under the Valley Forge Attendance Policy. Therefore, your employment at Graphic Packaging International terminated on May 29, 2021.

(Id.)  Plaintiff had a total of three attendance occurrence points in February 2021 and accumulated an additional 7.5 attendance points between March and May 2021 as follows:  one point for an absence on March 20, 2021; one point for an absence on April 17, 2021; one point for an absence on May 6, 2021; one point for a late call out on May 6, 2021; one point for an absence on May 7, 2021; one point for an absence on May 17, 2021, 1/2 point for being late on May 24, 2021, and one point for an absence on May 29, 2021.  (Moore Decl. Ex. D at APPX 0490.)

During the same time frame in which he incurred the 7.5 attendance points listed above, Plaintiff was also disciplined for other conduct.  On May 11, 2021, he was suspended for two days for parking in a handicapped space and for parking in a different unauthorized spot when he was asked to move his car.  (Boston Dep. Vol. 2 at 240-41; id., Ex. 4 at APPX 0130-32; Pl. Ex. 12 at Supp_GPI_Boston 0000190.)  Plaintiff had also parked in the handicapped space on three or four other occasions.  (Boston Dep. Vol. 2 at 247.)

During his employment at GPI, Plaintiff also encountered racism.  Specifically, on April 29, 2020, a GPI employee, William Dennis, referred to Plaintiff using the "N-word".  (GPI Ex. J

at APPX 0400, 0403.)  On that date,  Mr. Dennis and Taylor Steel, another employee, were setting up rolls on a machine and noticed Plaintiff, who had used the machine the night before, had set up the rolls improperly.  (Id. at APPX 0400-01, 0403-04.)  Mr. Dennis said to Mr. Steel: "I can't believe that nigger did this."  (Id. at APPX 0400)  Although Plaintiff was not present when Mr. Dennis made this statement, Mr. Steel and another employee were both present and heard the statement.  (Boston Dep. Vol. 1 at 54; GPI Ex. J at APPX 0401.)  Mr. Steel told his supervisor Wayne Nonamaker.  (GPI Ex. J at APPX 0401, 0403.)   Mr. Dennis, who is Caucasian, worked on the same machine as Plaintiff and they were the same level employee. (GPI Ex. J at APPX 0404; Boston Dep. Vol. 1 (Pl. Ex. 1.D.) at 73-74, Vol. 2 at 224; Joint Concise Statement of Stipulated Facts ¶¶ 29-30.)  Plaintiff heard about Mr. Dennis's remark and sent an April 29, 2020 email to Kevin Morrison, who was then GPI's Human Resources Manager, stating:  "I'm hearing that my coworker William Dennis used a racial slur when referring to me in front of 2 other coworkers.  I hope that you guys are taking this seriously, because I'm taking this EXTREMELY serious!!!!!!"  (Boston Dep. Vol. 2 at APPX 0087, 0091.)  Mr. Morrison responded by email the next day, stating that GPI was aware of the issue, had begun an investigation and "[took] these situations very seriously."  (Id. at APPX 0091.)  Mr. Morrison conducted an investigation and, on April 30, 2020, suspended Mr. Dennis for two days. (GPI Ex. J at APPX 0403.)  GPI's Director of Human Resources reviewed the investigation and, on May 4, 2020, instructed Mr. Morrison to convert Mr. Dennis's suspension to termination as of May 5, 2020.  (Def. Ex. M at APPX 0480.)

The record also contains a picture of a metal wall in a bathroom at GPI's Valley Forge plant, on which the words "FUCK GPI" and a swastika were scratched.  (Pl. Resp. at 1, Boston Decl. (Pl. Ex. 1.B) ¶ 15.)  Mr. Morrison testified at his deposition that he was not aware of any

4

GPI employee coming forward to report the profanity and swastika scratched on this wall. (Morrison Dep. at 47-48.)

Plaintiff asserts claims for race discrimination based on disparate treatment, hostile work environment and retaliation in violation of 42 U.S.C. § 1981 (Count I) and Title VII (Count II). GPI has moved for summary judgment with respect to all of Plaintiff's claims, arguing that Plaintiff has no evidence that there was a hostile work environment at GPI, or that any decisionmaker at the company took actions against him either based on his race or in retaliation for protected conduct.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. In ruling on a summary judgment motion, we "construe the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion." Jacobs v. Cumberland Cnty., 8 F.4th 187, 192 (3d Cir. 2021) (citing Bland v. City of Newark, 900 F.3d 77, 83 (3d Cir. 2018)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the

district court[] that there is an absence of evidence to support the nonmoving party's case." Id. at

325.   After the moving party has met its initial burden, the adverse party's response "must

support the assertion [that a fact is genuinely disputed] by" (A) citing to particular parts of

materials in the record . . . or (B) showing that the materials [that the moving party has cited] do

not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

We will grant summary judgment if the nonmoving party fails to respond with a factual

showing "sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.   "'While the

evidence that the non-moving party presents may be either direct or circumstantial, and need not

be as great as a preponderance, the evidence must be more than a scintilla.'" Galli v. New Jersey

Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cnty. Fam.

YMCA, 418 F.3d 265, 267 (3d Cir. 2005)).   However, "[u]nsupported assertions, conclusory

allegations, or mere suspicions are insufficient to overcome a motion for summary judgment."

Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) (citing Williams v.

Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)).

## III.    DISCUSSION

### A.    Race Discrimination – Disparate Treatment

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion,

sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  Section 1981 provides, in pertinent part,

as follows:

> All persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties, give

evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

42 U.S.C. § 1981(a). "Although § 1981 does not itself use the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." St. Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609 (1987) (citing Runyon v. McCrary, 427 U.S. 160, 168 (1976) ). We analyze race discrimination claims brought pursuant to § 1981 under the same standard under which we analyze such discrimination claims under Title VII. Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 256-57 (3d Cir. 2017) ("The substantive elements of a [racial discrimination] claim under § 1981 are generally identical to the elements of an employment discrimination claim under Title VII.'" (alteration in original) (quotation omitted)).

Where, as here, there is no direct evidence of discrimination, claims of race discrimination in employment are analyzed under the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). See Kant v. Seton Hall Univ., 289 F. App'x 564, 566 (3d Cir. 2008) (citations omitted). That "framework requires that the plaintiff first establish a *prima facie* case of discrimination." Tourtellotte v. Eli Lilly & Co., 636 F. App'x 831, 842 (3d Cir. 2016). "If the plaintiff successfully meets the requirements of a prima facie case, the burden then shifts to the employer to articulate a legitimate . . . nondiscriminatory reason for its actions." Id. "If the employer produces such a reason, the burden then shifts back to the plaintiff to prove that the employer's . . . nondiscriminatory explanation is merely a pretext for the discrimination . . . ." Id. (citing McDonnell Douglas, 411 U.S. at 802-04; Atkinson v. LaFayette Coll., 460 F.3d 447, 454 (3d Cir. 2006)). To defeat a motion for summary judgment at the pretext stage "the [plaintiff] 'must point to some evidence,

direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  Id. (quoting Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006)).

### 1. The prima facie case

In order to establish a prima facie case of discrimination based on disparate treatment, Plaintiff must demonstrate the following:  "'(1) [he] is a member of a protected class; (2) [he] was qualified for the position [he] sought to attain or retain; (3) [he] suffered an adverse employment action; and (4) *the action occurred under circumstances that give rise to an inference of intentional discrimination*.'"  Qin v. Vertex, Inc., 100 F.4th 458, 473 (3d Cir. 2024) (alterations in original) (quoting Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)).  GPI argues that Plaintiff has not established a prima facie case because he cannot show that he experienced an adverse employment action under circumstances that would give rise to an inference of unlawful discrimination.

### a. adverse action

The parties agree that Plaintiff suffered an adverse action when he was terminated from his job with GPI.  Plaintiff also asserts that the two-day suspension he was given for parking in an unauthorized space was an adverse employment action,[1] and that he suffered an adverse employment action when he was transferred to work on a new machine and then written-up for underperforming.  The law is clear that "'Title VII and section 1981 . . . do not provide relief for

---

[1] The record evidence does not explicitly state whether Plaintiff's two-day suspension was paid.  (See, e.g. Boston Dep. Vol. 2, Ex. 4 at APPX 0130-32.)   Drawing all inferences in Plaintiff's favor, we assume, for the purposes of the instant Motion for Summary Judgment, that Plaintiff's suspension was unpaid.  Jacobs, 8 F.4th at192 (citing Bland, 900 F.3d at 83).

general unpleasantness that can occur in the workplace, even if that unpleasantness may be motivated by racial animus. Rather, those statutes provide relief only if discrimination is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"  Barnees v. Nationwide Mut. Ins. Co., 598 F. App'x 86, 90 (3d Cir. 2015) (quoting Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004)) (citation omitted). "An 'adverse employment action' is 'one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"  Hartman v. Select Rehab., LLC, 528 F. Supp. 3d 373, 383 (E.D. Pa. 2021) (quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001))  The term "includes 'firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  Id. (quoting Remp v. Alcon Labs., Inc., 701 F. App'x 103, 106-07 (3d Cir. 2017)).  It also includes "reassigning an employee to a 'dead-end' position that was soon eliminated, . . . giving an employee a potentially less profitable sales position . . .; failing to rehire someone, and revoking a person's office, dismissing her secretary, and assigning her less work."  Id. (quotation and citations omitted).

"A suspension without pay may qualify as an adverse employment action for purposes of establishing a *prima facie* case of discrimination."  Friel v. Mnuchin, 474 F. Supp. 3d 673, 687 (E.D. Pa. 2020), (citation omitted), aff'd, No. 20-2714, 2021 WL 6124314 (3d Cir. Dec. 28, 2021).  Accordingly, we find that the evidence of Plaintiff's two-day suspension without pay for parking in unauthorized spaces is sufficient to support a conclusion that the suspension constituted an adverse employment action for the purposes of Plaintiff's discrimination claim. "On the other hand, lateral transfers or changes in title absent evidence of a material change in an employee's working conditions generally do not constitute adverse employment actions."

Hartman, 528 F. Supp. 3d at 383 (citing Fiorentini v. William Penn Sch. Dist., 665 F. App'x 229, 234 (3d Cir. 2016); Daniels v. Sch. Dist. of Phila., 982 F. Supp. 2d 462, 479 (E.D. Pa. 2013), aff'd 776 F.3d 181 (3d Cir. 2015)).   Here, Plaintiff argues that he suffered a third adverse employment action when he was transferred to a new department and then written up for underperforming.  (Boston Decl. ¶ 12.)  However, Plaintiff successfully grieved this write up and there is no evidence that he was otherwise disciplined in connection with this or any other transfer.  (See id.)  There is also no other record evidence that Plaintiff experienced any change in his working conditions when he was reassigned to work on new machines.  Accordingly, we find that Plaintiff has not shown that the transfer was an adverse employment action.

### b.    inference of unlawful discrimination

GPI argues that Plaintiff cannot establish a prima facie case because he cannot point to any evidence to prove the fourth element of a prima facie case, i.e., that the asserted adverse employment actions occurred "under circumstances that could give rise to an inference of intentional discrimination."   Qin, 100 F.4th at 473 (quotation and emphasis omitted).   To establish this element, a plaintiff "must produce 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion.'"  Leftwich v. Lew, Civ. A. No. 15-300, 2015 WL 8773274, at *7 (E.D. Pa. Dec. 14, 2015) (quoting Kier v. F. Lackland & Sons, LLC, 72 F. Supp. 3d 597, 608-09 (E.D. Pa. 2014)), aff'd sub nom. Leftwich v. Sec'y United States Dep't of the Treasury, 741 F. App'x 879 (3d Cir. 2018).  A plaintiff "can support an inference of discrimination 'in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial

animus.'" Id. (quoting Golod v. Bank of Amer. Corp., 403 F. App'x 699, 702 n.2 (3d Cir. 2010)).

Plaintiff argues that there is record evidence that supports an inference that he was terminated as a result of unlawful discrimination because he was replaced by Doug Detweiler, who is white. (Boston Decl. ¶ 23.)  Discriminatory intent for purposes of the prima facie case can be inferred from the fact that the plaintiff's "replacement is of a different race than the plaintiff." Heard v. J & G Spas, LLC, Civ. A. No. 22-3212, 2024 WL 1511901, at *5 (E.D. Pa. Apr. 8, 2024) (citing McDonnell Douglas, 411 U.S. at 802; Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999)).  We conclude, accordingly, that Plaintiff has pointed to record evidence that could establish a prima facie case of discrimination with respect to his termination.

Plaintiff also argues that there is record evidence that supports an inference that he was given a two-day suspension as a result of unlawful discrimination because GPI treated other employees who parked in the handicapped parking spot more favorably.  Plaintiff points to two videos showing cars parked in a handicapped spots with no visible handicapped placards or license plates.  (See Pl. Ex. 4.)  The videos indicates that they were filmed on March 24 and May 12, but Plaintiff has produced no evidence of the year in which the videos were made.  (Id.)  Plaintiff has also produced no evidence regarding who parked in the handicapped spot that day, whether that individual was an employee of GPI, or the race of any other GPI employees who improperly parked in handicapped parking spots without punishment.  Moreover, Plaintiff has admitted that he was not suspended for merely parking in the handicapped parking spot, but also for failing to move his car into an authorized spot when he was asked to do so.  (Boston Dep. Vol. 2 at 241.)  We thus conclude that Plaintiff has not pointed to sufficient record evidence to

support an inference of discrimination with respect to his two-day suspension for parking in the handicapped parking space and then moving his car into another unauthorized space. Plaintiff has therefore failed to establish a prima facie case of disparate treatment with respect to his two-day suspension.

### 2.    GPI's reason for terminating Plaintiff

As Plaintiff has pointed to sufficient record evidence to support a prima facie case of discrimination with respect to his termination, the burden shifts to GPI "to articulate a legitimate . . . nondiscriminatory reason" for the termination. Tourtellotte, 636 F. App'x at 842. GPI asserts that it terminated Plaintiff's employment because he had accumulated sufficient points under the attendance policy to warrant termination. As we discussed above, GPI's attendance policy provides that an employee will be terminated for accruing nine attendance points. (GPI Ex. C ¶ 3.5.1.) The evidence before us shows that Plaintiff had four attendance points on March 20, 2021. (GPI Ex. J at APPX 0320, 0326; GPI Ex. O at APPX 0490.) Plaintiff accrued an attendance point on April 17, 2021, bringing his total to five. (Id.) Plaintiff subsequently accrued another attendance point for a late call out on May 6, 2021 and an additional three points for absences on May 6, May 7 and May 17. (Id.) Thus, he had accrued a total of nine attendance points as of May 17, 2021. (Id.) Plaintiff was late to work on May 24, 2021 and he was absent on May 29, 2021, thus accumulating a total of 10.5 attendance points before he was retroactively terminated on June 3, 2021. (Id.) We conclude that GPI has met its burden of "articulat[ing] a legitimate . . . nondiscriminatory reason" for terminating Plaintiff. Tourtellotte, 636 F. App'x at 842.

3.    Pretext

Since GPI has produced evidence that it had a legitimate, nondiscriminatory reason to terminate Plaintiff's employment, the burden shifts back to Plaintiff to point to evidence that GPI's reason for his termination "is merely a pretext" for discrimination.  Id. (citations omitted). In order to show pretext and "defeat summary judgment at the third McDonnell Douglas step," Plaintiff is obligated to "'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 347 (3d Cir. 2022) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).  "An employee may meet [his] burden by 'painting the [employer's articulated reasons] as weak, implausible, contradictory, or incoherent.'"  Id. (second alteration in original) (quoting Fuentes, 32 F.3d at 765).  The employee may also meet this burden "'by showing that the employer in the past had subjected [the employee] to unlawful discriminatory treatment, [or] that the employer treated other, similarly situated persons not of his protected class more favorably.'"  Id. (alterations in original) (quoting Fuentes, 32 F.3d at 765).  "If the plaintiff makes this showing, summary judgment is improper because the plaintiff has raised 'a factual issue regarding the employer's true motivation for discharge.'"  Id. (quoting Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989)).  "We look at the totality of the circumstances to determine whether an employer's proffered nondiscriminatory reason is pretext for a discriminatory motive."  Id.

a.    statistical evidence

Plaintiff relies on three different types of evidence in attempting to show that GPI's reason for terminating his employment is pretextual.  He first relies on what he calls "statistical

evidence." Plaintiff argues that a reasonable fact finder could find that GPI's reason for terminating him is pretext because GPI employed a diverse workforce including racial minorities, yet has failed to promote any racial minorities to managerial positions. In support of this argument, Plaintiff points to the deposition testimony of Kevin Morrison, who stated that the workforce at the Valley Forge GPI location was very diverse, but there were no African American department managers or supervisors. (Morrison Dep. at 35, 37-38.)

"'Statistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext.'" Boykins v. SEPTA, 722 F. App'x 148, 155 (3d Cir. 2018) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 542 (3d Cir. 1992)). "But first, a plaintiff must demonstrate the statistical significance of the data." Id. (citing Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1112 n.4 (3d Cir. 1997); Berger v. Iron Workers Reinforced Rodmen, 843 F.2d 1395, 1420 (D.C. Cir. 1988)). Where the court must engage in speculation regarding the relevance of proffered statistical evidence, it may find that evidence to be insufficient. See Flax v. Dep't of Gen. Servs., Civ. A. No. 20-2211, 2024 WL 3717058, at *9 (M.D. Pa. Apr. 1, 2024) ("Statistical evidence is unconvincing if it requires the court to speculate about its relevance." (citing Newark Branch, N.A.A.C.P. v. City of Bayonne, N.J., 134 F.3d 113, 121 (3d Cir. 1998))), report and recommendation adopted, 2024 WL 3717275 (M.D. Pa. July 9, 2024).[2]

---

[2] In Flax, the court found that the statistics upon which the plaintiff relied required such significant speculation that they did not support the plaintiff's prima facie case:

> Here, the statistics cited by Flax require significant speculation. The evidence presented by Flax only shows that between 2016 and 2023, none of the 11 African American employees in the Capitol Police were promoted and 14 of the 163 white employees were promoted. It does not show how many African American officers applied for promotions between 2016 and 2023. Without that information, no reasonable juror could infer that the Capitol Police disproportionately promoted white officers over African American officers. Accordingly, in our

We conclude that Plaintiff's "statistical evidence" that none of GPI's Valley Forge managers are racial minorities fails to support a finding of pretext because Plaintiff has presented no evidence that would allow a factfinder to draw a reasonable inference that simply because no managers are racial minorities, GPI had a pattern of denying minority applicants managerial positions. Indeed, Plaintiff has not pointed to any evidence of GPI employees who applied for managerial positions and were denied such positions, much less evidence that any denied applicant was a racial minority. Under these circumstances, Plaintiff's "statistical evidence," such as it is, requires pure speculation as to the cause of the racial make-up of GPI's managerial ranks.[3] We thus conclude that this evidence does not provide support for a reasonable inference that GPI's reason for terminating Plaintiff was not credible or "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [GPI's] action." Canada, 49 F.4th at 347 (quotation omitted).

b.    the culture of discrimination

Plaintiff also relies on evidence of what he considers to be a culture of discrimination at GPI's Valley Forge location to support his contention that a reasonable fact finder could disbelieve GPI's reason for his termination or believe that GPI was actually motivated by invidious racial discrimination. See Canada, 49 F.4th at 347 (quotation omitted). "[E]vidence of an employer's 'culture' may constitute circumstantial evidence of discrimination." Johnson v.

---

view, Flax has not established a prima facie disparate treatment claim based on the defendants' failure to promote him.

Id. (citing Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 299-300 (3d Cir. 2014)) (record citations omitted).

[3] Indeed, it does not appear that Plaintiff's "statistical evidence" involves statistics. While all statistics use numbers, not all numbers, such as zero, are statistics.

Federal Express Corp., Civ. A. No. 12-444, 2014 WL 805995, at *8 (M.D. Pa. Feb. 28, 2014), (citing Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 333 (3d Cir. 1995)).

To support his argument that GPI had a culture of discrimination, Plaintiff relies on evidence that a profanity and a swastika had been scratched on a bathroom wall at the Valley Forge GPI location.  When Mr. Morrison was asked at his deposition if he recalled any GPI employee complaining about this image, he said that he did not.  (Morrison Dep. at 47-48.) Plaintiff contends that the fact that no one complained to HR is evidence that "no employee felt comfortable coming forward to human resources to let human resources know about this gross depiction."  (Pl. Resp. at 6 (citation omitted).)   However, Plaintiff does not support this contention with employee testimony or any other evidence about what may have dissuaded employees from lodging a complaint.  Rather, his contention is based entirely on supposition. Mr. Morrison was also asked at his deposition if he considered this image to be a racially charged image and he replied:  "I would consider it an image with racial implications on it.  I don't -- I can't say I would know what it was intended to speak to outside of the symbols that were on the picture.  I would have to fully investigate before assuming it was racially charged." (Morrison Dep. at 48.)  In Plaintiff's view, Mr. Morrison's failure to immediately denounce this image is evidence of a culture of racism at GPI.  Plaintiff also asserts that Mr. Morrison's response to this question is evidence that he and other GPI employees believed that GPI's management and HR "participated in the discrimination and/or did nothing to stop it."  (Pl. Reply at 6.)  These assertions are, again, based entirely on supposition.  We cannot find that Plaintiff's suppositions and a picture of a profanity and swastika scratched on a bathroom wall would support a finding that "an invidious discriminatory reason was more likely than not a

motivating or determinative cause of [GPI's] action." <u>Canada</u>, 49 F.4th at 347 (quotation omitted).

c.    <u>comparator evidence</u>

Plaintiff argues that evidence showing that he was treated differently than similarly situated individuals outside of his protected class with regard to attendance points shows that GPI's reason for his termination was pretext.   An employee can establish pretext "by demonstrating, among other things, that the employer treated other, similarly situated persons not of his protected class more favorably." <u>Qin</u>, 100 F.4th at 475 (quotation omitted).   The record contains evidence that GPI worked with seven employees to reduce their attendance points so that they could avoid discipline:

1.    **Michael Antenucci**:   Mr. Antenucci is a Caucasian man who was formerly employed by GPI.   (Joint Concise Statement of Material Facts ¶ 57.)   The evidence shows that he reached nine attendance points on June 28, 2019, which warrants termination under GPI's attendance policy.   (<u>See</u> Pl. Ex. 8 at Supp_GPI_Boston 0000105; GPI Ex. C ¶ 3.5.1.)   When GPI "review[ed] the attendance points with Mr. Antenucci, it was reiterated that his failure to submit a doctor's note in early February for this three-day illness, resulted in escalated point accumulation."   (Pl.'s Ex. 8 at Supp_GPI_Boston 0000105.)   In "a one-time non-precedent binding decision," GPI agreed with the union to consider Mr. Antenucci's medical absences as if he had submitted a doctor's note and to allow Mr. Antenucci to continue to work with his nine-point balance.   (<u>Id.</u>)   The agreement "require[d] Mr. Antenucci to successfully complete a sixty (60) calendar day exception period with no attendance infractions."   (<u>Id.</u>)   If Mr. Antenucci was successful, he would earn a credit point that would reduce his total attendance points, but, if he failed to "gain the credit point during the exception period" he would be immediately terminated.

(Id.)  After GPI reached that agreement with Mr. Antenucci and the union, GPI discovered that Mr. Antenucci had also been absent on July 8, 2019, meaning that he had ten attendance points rather than nine.  (Id. at Supp_GPI_Boston 0000106.)  Rather than terminate Mr. Antenucci, GPI extended his exception period to 120 days, allowing him avoid termination by gaining two credit points.  (Id.)

2.    **Tiffany Reilly**:  GPI removed a late point issued to Ms. Reilly on July 22, 2021 because her supervisor had approved a schedule change and failed to update the attendance system.  (Pl. Supp. Resp. Ex. 1 at Supp_GPI_Boston 0000216.)  Plaintiff states that Ms. Reilly is a Pacific Islander.  (Pl. Supp. Resp. at 10.)

3.    **Omar Patino**:  On August 5, 2021, GPI excused 2.5 attendance points that had been assigned to Mr. Patino due to clocking issues.  (Id. Ex. 1 at Supp_GPI_Boston 0000217.) GPI considered giving Mr. Patino an additional attendance point for missing work on January 9, 2022, which would have resulted in his accruing 9.5 points and being terminated, but he was not given that attendance point because he had called out that day.  (Id. Ex. 1 at Supp_GPI_Boston 0000228-29.)  Plaintiff states that Omar Patino is Hispanic.  (Pl. Supp. Resp. at 10.)

4.    **Jon Hahn**:  GPI excused an absence for Mr. Hahn on September 7, 2021.  (Id. Ex. 1 at Supp_GPI_Boston 0000218.)  He had been stuck on back roads and was unable to get to work.  (Id.)  He had submitted a police report to support his absence.  (Id.)  Plaintiff states that Jon Hahn is Caucasian.  (Pl. Supp. Resp. at 10.)

5.    **Roman Ramos**:  Mr. Ramos had accumulated nine attendance points as of October 25, 2021.  (Id. Ex. 1 at Supp_GPI_Boston 0000226.)  GPI reduced Mr. Ramos's attendance points to six (written warning) on November 11, 2021 as follows:  GPI reduced Mr. Ramos's total by one and one-half points as of June 11, 2021 because it had been 60 days since

he last accrued any attendance points and removed one and one-half points that he had been assigned for an absence on June 15, 2021, because his absence that day had been scheduled. (Id.)  Plaintiff states that Mr. Ramos is African American.  (Pl. Supp. Resp. at 10.)

6.    **Andy Webb**:  Mr. Webb was given four points for being AWOL on September 26, 2021.  (Id. at Ex. 1 at Supp_GPI_Boston 0000225.)  He had not clocked in that day and arrived late at his worksite.  (Id. Ex. 1 at Supp_GPI_Boston 0000220.)  He also left early without permission.  (Id. Ex. 1 at Supp_GPI_Boston 0000220-22.)  That resulted in a total of nine and one-half points, which should have resulted in termination under GPI's attendance policy.  (Id. Ex. 1 at Supp_GPI_Boston 0000224-25.)  However, those four points were removed because GPI was working on corrective action.  (Id. Ex. 1 at Supp_GPI_Boston 0000224.)  Plaintiff states that Andy Webb is African American.  (Pl. Supp. Resp. at 10.)

7.    **Derrick Hamilton**:  Mr. Hamilton had a total of nine and one-half attendance points on July 14, 2020.  (Id. Ex. 1 at Supp_GPI_Boston 0000237.)  Rather than terminate Mr. Hamilton, GPI agreed with the union to give Mr. Hamilton a last chance agreement on August 7, 2020.  (Id. Ex. 1 at Supp_GPI_Boston 0000245.)  Pursuant to this agreement, Mr. Hamilton was reinstated and his prior time off was considered to be a disciplinary suspension.  (Id. ¶ 1.)  The agreement also provided that any additional absenteeism on the part of Mr. Hamilton over the following six months would result in his immediate discharge.  (Id. ¶ 2.)  GPI asserts that Hamilton is African American.  (GPI Supp. Reply at 2.)

In addition to the individuals listed above, with whom GPI worked to reduce their attendance points, the record also contains evidence that GPI terminated Josh Berry, a Caucasian male, for having 14 attendance points on November 3, 2021.  (Pl. Supp. Resp. Ex. 1 at Supp_GPI_Boston 0000230-32.)

Plaintiff argues that this evidence shows that "GPI frequently exercised discretion to reduce or overlook attendance points for favored employees . . . while applying a stricter standard to [him]."  (Pl. Supp. Resp. at 1.)  He also contends that this evidence "exposes a pattern of inconsistent application of the company's attendance policy," showing that GPI "frequently worked with select employees to reduce their attendance points, even after accumulating enough for termination."  (Id. at 2.)  However, even accepting that the attendance policy was not consistently applied, the evidence of record does not show that those employees receiving more favorable treatment were outside of Plaintiff's protected class.  Rather, of the seven identified individuals with whom GPI worked to reduce their attendance points, three (Mr. Hamilton, Mr. Webb, and Mr. Ramos) are African American; one (Mr. Patino), is Hispanic; one (Ms. Reilly) is a Pacific Islander; and two (Mr. Hahn and Mr. Antenucci) are Caucasian.  Indeed, of the four employees with whom GPI worked to reduce their attendance points after they had accrued sufficient attendance points to warrant termination, one is Caucasian and the other three are African American.  Evidence of "comparator employees . . . of multiple races . . . does not support a claim that race [was a] motivating or determinative factor[] in the adverse employment action[]."  Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d Cir. 2011).  Thus, the evidence regarding GPI's treatment of individuals who were similarly situated to Plaintiff because they, too, had accrued nine or more attendance points does not support a reasonable inference that race was a motivating factor for Plaintiff's termination.

Having found that Plaintiff has not pointed to any evidence that could support a finding that GPI's stated reason for terminating his employment was actually pretext for race discrimination, we conclude that he has failed to meet his summary judgment burden of pointing to evidence "sufficient to establish the existence of an element essential to [his case]."  Celotex,

477 U.S. at 322.  Consequently, we grant GPI's Motion for Summary Judgment with respect to Plaintiff's disparate treatment claim under § 1981 and Title VII.

      B.     <u>Hostile Work Environment</u>

      GPI argues that it is entitled to summary judgment as to Plaintiff's hostile work environment claims on the grounds that Plaintiff cannot establish that he was subjected to a hostile work environment based on his race.  To establish a prima facie case of employment discrimination due to a hostile work environment, a plaintiff must demonstrate the following five elements:  "(1) [h]e suffered intentional discrimination because of [his] race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [him]; (4) the discrimination would have detrimentally affected a reasonable person of the same race in [his] position; and (5) there is a basis for employer liability."  <u>Leftwich</u>, 741 F. App'x at 882 (citing <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1081 (3d Cir. 1996)).  Discrimination is severe or pervasive if it "'alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment.'"  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 786 (1998) (second alteration in original) (quoting <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)).  "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  <u>Id.</u> at 788 (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998)).  "The hostility of a work environment must be determined by the totality of the circumstances."  <u>Fichter v. AMG Res. Corp.</u>, 528 F. App'x 225, 230 (3d Cir. 2013) (citing <u>Harris v. Forklift Sys.</u>, 510 U.S. 17, 23 (1993)).  "Such circumstances may include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  <u>Id.</u> (quoting <u>Harris</u>, 510 U.S. at 23).

1.    Existence of a hostile work environment

Plaintiff argues that Mr. Dennis's use of the "N-word" to describe him is sufficient to establish a hostile work environment.  The Third Circuit has examined whether, "[u]nder the correct 'severe or pervasive' standard, . . . [a] supervisor's single use of the 'n-word' is adequately 'severe' and if one isolated incident is sufficient to state a claim under that standard." Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017).  The Third Circuit determined that, while "the resolution of that question is context-specific, it is clear that one such instance can suffice to state a claim."  Id. (citing Faragher, 524 U.S. at 788; Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (per curiam)) (add'l citation omitted).  "However, a plaintiff must plead the incident to 'be [sufficiently] extreme to amount to a change in the terms and conditions of employment' for it to serve as the basis of a harassment claim."  Id. (quoting Faragher, 524 U.S. at 788).

In this case, the employee who used the "N-word" to describe Plaintiff was Plaintiff's coworker, not a supervisor.[4]  The Third Circuit has determined that a single use of the "N word" by a co-worker, rather than a supervisor, is not sufficient to establish a hostile work environment if there is "no other evidence suggesting some racial animus in the workplace" and the comment "did not unreasonably interfere[] with [the plaintiff's] work performance, discourage[] him from remaining on the job, or interfere[] with advancement."  Gladden v. Ambler Healthcare Grp., LLC, No. 22-3432, 2024 WL 260960, at *2 (3d Cir. Jan. 24, 2024) (quotations omitted).  Moreover, if the employer intervenes in a way that prevents repetition of the slur, the employer cannot be liable.  Id. (citing Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 110

---

[4] As we discussed supra, Mr. Dennis and Plaintiff were both GPI employees at the same level.  (Boston Dep. Vol. 2 at 224.)  Both men worked on the same machine; Mr. Dennis operated the machine during the day shift, while Plaintiff operated the machine during the night shift.  (See Boston Dep. Vol. 1 at 73-74.)

(3d Cir. 2009)).  See also Huston, 568 F.3d at 110 ("[T]he employer cannot be liable under Title

VII if its remedial action stopped the harassment." (citation omitted)).

The record contains some evidence beyond Mr. Dennis's remark upon which a jury could

find that there is some racial animus at GPI's Valley Forge facility, namely the swastika and

profanity scratched into the metal wall of the men's bathroom.  (See Pl. Resp. at 1.)  However,

Plaintiff has pointed to no evidence that Mr. Dennis's use of the "N-word" discouraged him from

staying at GPI or interfered with his advancement.  The evidence also shows that GPI intervened

in a way that prevented Mr. Dennis from repeating the slur.  Specifically, Mr. Morrison

immediately investigated the incident and placed Mr. Dennis on suspension the next day.  (GPI

Ex. J at APPX 0403.)  GPI's Director of Human Resources reviewed the investigation and, on

May 4, 2020, instructed Mr. Morrison to convert Mr. Dennis's suspension to termination as of

May 5, 2020.  (GPI Ex. M at APPX 0480.)  We conclude, based on the evidence of record, that

GPI cannot be found liable for Mr. Dennis's remark because the evidence shows that GPI

prevented Mr. Dennis from repeating his conduct by immediately suspending and then firing

him.  See Gladden, 2024 WL 260960, at *2 (citing Huston, 568 F.3d at 110).  We further

conclude, accordingly, that Plaintiff has failed to point to evidence that establishes a genuine

issue of material fact regarding whether he has demonstrated a prima facie case that he was

subjected to a racially hostile work environment at GPI and we grant the instant Motion with

respect to Plaintiff's hostile work environment claims under § 1981 and Title VII.

C.    Retaliation

GPI argues that it is entitled to summary judgment with respect to Plaintiff's retaliation

claim because Plaintiff cannot establish a prima facie case of retaliation under § 1981 and Title

VII.  Under the McDonnell Douglas framework, a plaintiff asserting a retaliation claim first must

establish a prima facie case by showing "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Daniels, 776 F.3d at 193 (alteration in original) (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)). "If the plaintiff makes these showings, the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action." Id. (citing Marra, 497 F.3d at 300). "If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Id. (quoting Marra, 497 F.3d at 300).

### 1.    Protected Activity

"For purposes of the first prong of a prima facie case of retaliation, protected 'opposition' activity includes not only an employee's filing of formal charges of discrimination against an employer but also 'informal protests of discriminatory employment practices, including making complaints to management.'" Id. (quoting Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)) (add'l citation omitted). "Furthermore, although a plaintiff in a retaliation case 'need not prove the merits of the underlying discrimination complaint,' she must have 'act[ed] under a good faith, reasonable belief that a violation existed.'" Id. (alteration in original) (quoting Moore v. City of Philadelphia, 461 F.3d 331, 344 (3d Cir. 2006)). "This standard requires an 'objectively reasonable belief' that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute." Id. at 193-94 (quoting Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008)).

GPI acknowledges, for purposes of this Motion, that Plaintiff engaged in protected activity when he complained about Mr. Dennis referring to him using the "N-word" and that he experienced an adverse employment action when he was terminated. (GPI Br. at 21.) Plaintiff points to evidence that he engaged in additional protected activity when, at least one year before he complained about Mr. Dennis, he complained to Mr. Morrison that he "was being harassed by coworkers and management, Mr. Nonamaker, Mr. Moore, and Mr. Dennis because [he is] Black. (Boston Decl. ¶ 4.) Plaintiff also "complained to [his] international union representative, John Ashe. [He] told him that [he] was being profiled by Gary Moore, William Dennis, and another manager." (Id. ¶ 6.) However, Plaintiff does not state when he made this complaint. Based on GPI's concession and the record evidence, we conclude that Plaintiff has adequately established that he engaged in protected activity. Moreover, there is no dispute that Plaintiff was subjected to an adverse employment action when he was terminated on June 3, 2021.

GPI nevertheless argues that it is entitled to summary judgment in its favor with respect to Plaintiff's retaliation claims because Plaintiff cannot point to evidence of a causal connection between his protected activity and his termination. Causation can be shown "by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity 'unusually suggestive of retaliatory motive.'" Carvalho-Grevious, 851 F.3d at 260 (quoting Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) (citations omitted). "'[T]he proffered evidence, looked at as a whole, may [also] suffice to raise the inference.'" Id. (quoting Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)). The Third Circuit has held that "on its own, an intervening temporal period of two days may raise the inference of causation but that a period of two months cannot." Id. at 261 n.8

(citing <u>Jalil</u>, 873 F.2d at 708; <u>Williams v. Phila. Hous. Auth. Police Dep't</u>, 380 F.3d 751, 759-60 (3d Cir. 2004)).

Plaintiff has pointed to no evidence that GPI gave inconsistent explanations for his termination.  There is also insufficient temporal proximity to suggest a retaliatory motive in this case.  Plaintiff complained to Mr. Morrison about Mr. Dennis referring to him as an "N-word" on April 29, 2020.  (<u>See</u> Boston Dep. Vol. 2 at APPX 0087.)  By Plaintiff's own account, his other complaints to GPI's management about racial harassment took place at least a year before his complaint about Mr. Dennis and there is no evidence regarding when he complained to his union representative.  (<u>See</u> Boston Decl. ¶¶ 4, 6.)  GPI terminated Plaintiff's employment by letter dated June 3, 2021.  (Boston Dep. Vol. 1 at APPX 0307.)  Plaintiff was thus terminated by GPI more than one year after he engaged in protected activity by complaining to Mr. Morrison about Mr. Dennis and more than two years after his complaints about racial harassment to GPI management.  Under these circumstances, Plaintiff's protected activity and his termination are not close enough in time to raise a reasonable inference of causation.[5]  <u>Carvalho-Grevious</u>, 851 F.3d at 261 n.8 (citations omitted); <u>see also</u> <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." (citations omitted)); <u>Gethers v. PNC Bank</u>, 813 F. App'x 746, 750 (3d Cir. 2020) (determining that termination approximately one year after the plaintiff's protected activity did

---

[5] Since we have no evidence regarding the timing of Plaintiff's complaint to his union representative, we cannot find that the evidence regarding this protected activity could raise a reasonable inference of causation.

"not raise an inference of a connection between [the plaintiff's] complaint and the termination" (citing LeBoon, 503 F.3d at 233)).

The Third Circuit has instructed that "where there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference" that there is a causal link between the protected activity and the adverse employment action. Kachmar, 109 F.3d at 177 (quoting Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993)). Plaintiff argues that there is evidence in the record that would establish a pattern of antagonism following his protected conduct, and specifically points to evidence of three instances of alleged antagonism that followed his protected activity. In the first, which Plaintiff recounted in his deposition, Mr. Moore told other managers to write him up over small matters, although Plaintiff has presented no evidence as to how many times such write ups occurred, if at all. (Boston Dep. Vol. 1 at 90-92.) In the second, also recounted in Plaintiff's deposition, Mr. Moore cursed at him for running his machine too slowly and looking at his phone, conduct for which Plaintiff was disciplined. (Id. at 40-43; Boston Dep. Vol. 2 Ex. 4 at APPX 0189.) Notably, Plaintiff filed a grievance regarding this incident and, as a result, on November 21, 2019, Plaintiff's discipline was reduced to a written warning for using his phone. (Boston Dep. Vol. 2, Ex. 4 at APPX 0189.) The third incident of alleged antagonism is Plaintiff's May 11, 2021 suspension for parking in a handicapped parking place and then moving his car into another unauthorized parking space. (See Boston Decl. ¶¶ 20-22; Boston Dep. Vol. 2 at 240-41.)

While Plaintiff argues that there were additional instances of antagonism or discipline, he has presented no evidence that these instances occurred after his protected activity. For instance, he testified at his deposition that Mr. Moore would not allow him to drive a forklift even though

he had obtained a forklift certification at GPI's direction.  (See Boston Dep. Vol. 2 at 192-94.)

However, instead of placing Mr. Moore's conduct within a specific time frame, he merely

testified that Moore "had a problem with it at some point."  (Id. at 193.)    Similarly, Plaintiff

states in his Declaration that he won a grievance against Mr. Moore for unfairly writing him up

over not signing paperwork, but he introduces no evidence that this occurred after he engaged in

protected activity.  (Boston Decl. ¶ 10.)    And finally, Plaintiff attests in his Declaration or

testified at his deposition about three other incidents of antagonism, but there is no evidence in

the record as to when any of these incidents occurred, much less that they occurred after

Plaintiff's protected activity. These three incidents are:  (1)  three different managers, including

Mr. Moore,  transferred him to slow his production numbers and Plaintiff successfully grieved

one of those transfers that had resulted in a write-up (id. ¶¶ 11-13); (2) Mr. Moore wrote up

Plaintiff for using the wrong materials on a job and, after Plaintiff complained to Mr. Moore's

boss, the write-up was dismissed (Boston Dep. Vol. 1 at 37-39); (3) a different manager, Matt

McMenamin, yelled at Plaintiff for using the bathroom at the end of his shift (id. at 44-46).

"A 'pattern of antagonism' is a consistent and continuous pattern of conduct, which can

include a 'constant barrage of written and verbal warnings,' as well as disciplinary action."

Stinson v. Triple Canopy, Inc., Civ. A. No. 21-4557, 2023 WL 4793993, at *6 (E.D. Pa. July 26,

2023) (quoting Bartos v. MHM Corr. Servs., Inc., 454 F. App'x 74, 79 (3d Cir. 2011)).  Where,

as here, Plaintiff has pointed to evidence of only three instances in which he was disciplined or

harassed by GPI management after he engaged in protected conduct, and these incidents

occurred over a period of approximately two years, no reasonable factfinder could find that there

was "a consistent and continuous pattern of conduct" or that the incidents comprised a "constant

barrage of written and verbal warnings."  Id. (quotation omitted).  Accordingly, we conclude that

28

Plaintiff has not satisfied his burden of pointing to evidence of a pattern of antagonism that would demonstrate a casual link between his protected activity and his termination.  <u>See</u> <u>Kachmar</u>, 109 F.3d at 177 (quotation omitted).  We conclude, accordingly, that Plaintiff has not established a prima facie case of retaliation in violation of Title VII and § 1981.

**IV.    CONCLUSION**

For the foregoing reasons, we grant GPI's Motion for Summary Judgment and enter judgment in favor of GPI with respect to both of Plaintiff's claims for relief.  An Order follows.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.